# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**19-21**


JUANITA W. FONTENOT AND

T. JUNE WILDER

VERSUS

GILCHRIST CONSTRUCTION COMPANY, LLC


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. C2012-146
HONORABLE F. RAE SWENT, AD HOC


\*\*\*\*\*\*\*\*\*\*


**SHANNON J. GREMILLION**
**JUDGE**


\*\*\*\*\*\*\*\*\*\*


Court composed of Shannon J. Gremillion, Candyce G. Perret, and Jonathan W. Perry, Judges.


**AFFIRMED AS AMENDED.**

**Murphy J. Foster, III**
**John T. Andrishok**
**Breazeale, Sachse & Wilson, L.L.P.**
**23rd Floor, One American Place**
**Post Office Box 3197**
**Baton Rouge, LA 70821-3197**
**(225) 387-4000**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Gilchrist Construction Company, L.L.C.**

**Loulan J. Pitre, Jr.**
**Jane A. Jackson**
**Kelly Hart Pitre**
**400 Poydras Street, Suite 1812**
**New Orleans, LA 70130**
**(504) 522-1812**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Gilchrist Construction Company, L.L.C.**

**Edward E. Rundell**
**Kay H. Michiels**
**Stephen A. LaFleur**
**Gold, Weems, Bruser, Sues & Rundell**
**Post Office Box 6118**
**Alexandria, LA 71301**
**(318) 445-6471**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Gilchrist Construction Company, L.L.C.**

**James G. Theus**
**Theus Law Office**
**2030 Jackson Street, Suite B**
**Alexandria, LA 71301**
**(318) 541-8999**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Gilchrist Construction Company, L.L.C.**

**Michael Reese Davis**
**Richard Allen Sherburne, Jr.**
**Tim P. Hartdegen**
**Hymel Davis & Petersen, L.L.C.**
**10602 Coursey Boulevard**
**Baton Rouge, LA 70816**
**(225) 298-8118**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **T. June Wilder**
    **Juanita W. Fontenot**

**Wells T. Watson**
**Bagget, McCall, Burgess, Watson & Gaughan**
**3006 Country Club Road**
**Post Office Drawer 7820**
**Lake Charles, LA 70606-7820**
**(337) 478-8888**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
> **Juanita W. Fontenot**
> **T. June Wilder**

**Herbert Todd Nesom**
**District Attorney, Thirty-third Judicial District Court**
**Post Office Box 839**
**Oberlin, LA 70655**
**(337) 639-2641**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
> **Juanita W. Fontenot**
> **T. June Wilder**

**GREMILLION, Judge.**

Defendant, Gilchrist Construction Company, LLC, appeals the trial court's judgment in favor of Plaintiffs, Juanita W. Fontenot and T. June Wilder. For the following reasons, we affirm as amended.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves extensive and complex litigation surrounding Defendant's use of Plaintiffs' land for purposes of completing its $30 million contract with the state to expand U.S. Highway 165 in Allen Parish, Louisiana. In March 2012, Plaintiffs filed a Petition for Damages and Breach of Contract relating to a series of contracts they entered into with Defendant for the excavation of dirt and storage of construction debris on their property. In their petition, Plaintiffs urged that Defendant dumped "asphalt, dirt, concrete, wood and trash" on their property and filled in the excavated dirt pit with "worthless dirt, debris, concrete, wood and trash from elsewhere." Plaintiffs claimed that Defendant under-measured and under-paid for the dirt it did haul away from the property, that it did not leave the property in the condition it promised to, and that it would cost millions of dollars to haul away the remaining debris left behind by Defendant. Plaintiffs alleged that Defendantt acted in bad faith in refusing to perform the contract in good faith resulting in damages including loss of income, underpayment, damages to land, damages to remove the debris, and damages to restore the land.

In March 2014, Plaintiffs moved for a motion for partial summary judgment seeking a declaration that their property was farmland, that Defendant was responsible for removing any concrete or debris that it dumped on the property, and that the property be returned to its original condition (i.e., farmland). The motion was granted in Plaintiffs' favor in June 2014. That judgment specifically found:

[I]t is hereby ruled that the general purpose of the Fontenot/Wilder property prior to entry by Defendant, Gilchrist Construction Company, LLC, was farmland, although it had been out of production for several years due to federal subsidies. . . .Gilchrist . . . has the obligation to restore the Fontenot/Wilder property to a condition suitable for farming, with the exception of the pond/pit and road.

By June 2016, Plaintiffs had filed three motions to compel discovery, all of which were granted in their favor. In January 2018, Defendant filed a motion to compel discovery responses. Defendant also filed a motion to strike Plaintiffs' claims for loss of income and motion in limine. Defendant further filed a motion to compel entry upon land for testing and inspection; for an order requiring written expert reports; and for continuance of the trial date.

In February 2018, Plaintiffs filed a first amended petition for breach of contract and damages. In March 2018, Plaintiffs filed a motion in limine to exclude certain irrelevant and overly prejudicial matters. They also filed a motion in limine to exclude certain opinions and testimony of Defendant's experts, Jerry Daigle and Chris Lemoine.

On March 12, 2018, Defendant filed an exception of no cause of action and prescription and answer to Plaintiffs' first amended petition for breach of contract and damages. On March 14, 2018, Plaintiffs filed an opposition to Defendant's exception of no cause of action and prescription.

On March 12, 2018, the trial court rendered reasons for judgment on a number of issues. It accepted "the argument by Plaintiffs that Corbello v. Iowa Production . . . is the controlling law in this case[,]" and found the market value of the property irrelevant. Further, the trial court found that as to the expert witness, Jerry Daigle, the issue of whether the land was "farmable" was not relevant to the issue of whether remediation was required. It further found that the appraised value of the land was

not relevant and, therefore, Chris Lemoine's opinion testimony would not be admissible.

On March 14, 2018, Defendant filed its proposed special jury instructions. On March 16, 2018, Plaintiffs filed an objection to Defendant's proposed special jury instructions and verdict form.

Following a jury trial in March 2018, the jury rendered a verdict finding that Plaintiffs had proven by a preponderance of the evidence that Defendant breached a contractual obligation it owed to Plaintiffs and that Defendant acted in bad faith. It awarded Plaintiffs $5,559,000.00, plus attorney fees.

On April 17, 2018, Defendant filed a motion to sign judgment and to continue the hearing on determination of attorney fees pending reconsideration on motion for new trial and appeal arguing that it was improper for the jury to determine if attorney fees should be awarded. The trial court denied the motion. On April 19, 2018, Defendant filed an opposition to Plaintiffs' motion to set attorney fees. On April 20, 2018, Defendant filed an opposition to Plaintiffs' motion to set costs. In May 2018, Defendant filed a post-trial rebuttal to Plaintiffs' motion for attorney fees and costs. On May 8, 2018, Plaintiffs filed a post-hearing brief regarding attorney fees and costs.

The trial court rendered written reasons for judgment on June 22, 2018. Therein, the trial court discussed the numerous motions filed as to what law was applicable, specifically with Plaintiffs arguing that *Corbello v. Iowa Production*, 02-0826 (La. 2/25/03), 850 So.2d 686, applied and Defendant arguing that *Roman Catholic Church v. Louisiana Gas Serv. Co.,* 618 So.2d 874 (La.1993), applied. The trial court also noted that the issue of whether attorney fees should be submitted to the jury was of concern between the parties. The trial court denied all of Defendant's motions noting that Defendant did not object to the inclusion of the issue of attorney

3

fees on the verdict form. The trial court granted Plaintiffs' motions to set attorney fees and expenses. It further accepted *Corbello* as the standard for damages to immovable property in breach of contract cases and found the facts of this case much more similar to *Corbello* than *Church*. The trial court noted that, "[t]he party found in breach and bad faith is a large and sophisticated business entity and the parties injured are farmland owners and members of the public. The inherent need to restore farmland is no different from the need to restore the land in the oil legacy litigation." The trial court thereafter set the attorney fee award at 40% of the total award, and expenses and costs in the amount of $51,077.66. The trial court signed a judgment memorializing such on August 21, 2018.

On September 4, 2018, Defendant filed a motion for new trial. Following an October 16, 2018 hearing, the trial court denied the motion for new trial in a judgment signed October 25, 2018, and filed into the record on November 19, 2018.

Defendant now appeals and assigns as error in its brief filed on February 20, 2019:

1. The District Court erred when it erroneously changed the established standard for the case four days prior to trial to the prejudice of Gilchrist.

2. The District Court erred in applying the *Corbello* standard because the unique circumstances of *Corbello* are not present in this case.

3. The District Court erred in applying the *Corbello* standard because there was no contract to restore the property to its original condition.

4. The District Court erred in ruling that Plaintiffs' claims were not prescribed.

5. The District Court erred with respect to several significant evidentiary rulings.

6. The District Court erred in rendering pre-trial rulings inconsistent with the jury instructions that precluded the jury from being able to render a verdict in accordance with the instructions.

7. The District Court erred in rendering a Judgment awarding unproven and excessive damages.

4

8. The District Court erred in awarding attorney's fees under the contracts, a purported bad faith breach of contract, and under La.C.C.P. at. 1472.

9. The District Court erred in awarding attorney's fees in an amount which was unproven and unreasonable.

Plaintiffs filed their brief on March 27, 2019. On April 5, 2019, Defendant filed a reply brief and additionally filed an exception of prescription reiterating its claim in its original brief that Plaintiffs' claims were prescribed. On April 15, 2019, Plaintiffs filed an opposition to Gilchrist's exception of prescription. On April 23, 2019, Plaintiffs filed a surreply brief. Pursuant to our discussion of assignment of error four below, Defendant's exception of prescription is denied.

**DISCUSSION**

We first note that Defendant does not argue that the jury was manifestly erroneous in its finding that it breached its contracts with Plaintiffs. Instead, it asserts a series of legal arguments to circumvent the jury's factual findings. Because the factual findings of the jury are of paramount importance in understanding the three contracts existing between the parties, we review the testimony given at trial.

*Plaintiffs' Case*

*Drew Fontenot*

Fontenot testified that he had been married to Juanita Wilder Fontenot for about twenty-three years, had attended bible college, farmed, and was a hospice chaplain for many years. He testified about his long history of rice farming hundreds of acres of Fontenot land, which he still did as of the date of the trial. He discussed the 250 acres of the Wilder property which he had managed since he married Juanita. Of the 120 acres in question, Fontenot testified that he also farmed rice on that acreage in 2000. Fontenot testified about his initial meeting with Carey Marcantel of Gilchrist in which Marcantel told him that Gilchrist needed soil for the highway

5

expansion. He described how Marcantel showed him other sites where ponds were created where the soil had been removed. Fontenot said that he believed it would improve the property and be a fun place to bring the grandkids so he told Juanita and June about Gilchrist's offer to purchase soil. He discussed the initial contract, the RIGHT OF ENTRY, he entered into on behalf of Juanita and June dated February 2, 2007. It states in pertinent part:

> KNOW ALL MEN BY THESE PRESENT THAT I HEREBY GRANT AUTHORITY FOR THE DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, IT'S [sic] AGENTS, ENGINEERS, AND/OR CONTRACTORS THE RIGHT TO ENTER UPON MY PROPERTY ADJACENT TO THE RIGHT-OF-WAY OF THE CAPTIONED PROJECT FOR THE PURPOSES OF CONSTRUCTION, WITHOUT COST TO ME, Excavation/Embankment, AT PROPERTY LOCATED [HANDWRITTEN] multiple 40 acre tracts see description on back.
>
> IT IS UNDERSTOOND THAT THIS GRANT IS MADE PROVIDED THAT GILCHRIST CONSTRUCTION COMPANY, L.L.C., WILL CORRECT ALL DAMAGES ARISING OUT OT ITS CONSTRUCTION OPERATIONS ON MY PROPERTY WHICH I HERERBY AUTHORIZE.

The document is signed by Marcantel as representative for Gilchrist. Fontenot discussed meeting with Marcantel again and the subsequent "Agreement to Buy/Sell Dirt" (the Dirt Agreement) that Juanita and June entered into on June 25, 2007. That contract stated in pertinent part:

> The buyer will maintain an access road for haul trucks to access the pit. Any clearing required to create the dirt pit will be performed by the Buyer with all cleared saplings or trees buried in the pit. Buyer will leave a clean, nicely shaped dirt pit to the sellers' satisfaction when all activities are complete. The slop[e] of the outer perimeter of the pit will be 4 to 1. The Buyer will also clear trees and brush on the outer perimeter of the tracts of land to property line. The Buyer will also construct an access road from Hwy 165 to Sellers land located at NW ¼ of NE ¼ of Section 7 Township 6 South; Range 4 West in Allen Parish North of existing Holiday Inn Express (referred to as Tract 1). The buyer will plate the bottom of the excavation if necessary, to ensure that the excavation holds water.
>
> The Seller will be held harmless by Gilchrist Construction Company L.L.C. from any future damages, injuries and/or claims

6

arising from the mining of dirt and clearing of vegetation on above tracts of land.

The Buyer will pay the Seller $.50 per cubic yard for all dirt that is purchased.

The Buyer will conduct a monthly survey of the excavated pit to determine the purchase quantity of dirt for each month, starting 30 days from the initial excavations. The Buyer will then pay the Seller every 30 days for dirt purchased. A copy of the survey will be included with each monthly payment. The seller, at any time, may bring in his own independent survey firm to verify Buyers quantities.

The Buyer will not dispose of any hazardous materials on this property.

Fontenot testified regarding the third agreement that he said occurred about a week to ten days after the Dirt Agreement. Fontenot said he was called into the Gilchrist office and met with Alsey Lachney:

And his words was, Drew, I need, I would like permission to temporarily to put a couple or a few loads on your property. And then I know I stopped right then and I says what are you gonna do with them. He said it is gonna be temporary. I said then what are you gonna do? I am gonna move it. I am gonna haul it off. And I was very meticulous, I said, Alsey, Carey, look, I want to see it down to where my topsoil was so I can farm this. It was important to me to get it at that level because I had spent a lot of time when I was farming it to water level to make sure it would flood. I didn't want a lot of holes so I wanted it done right. He said, Drew, I will do it just like it was my own. And at that point I had had a lot of discussions with both of them. I trusted Carey. I have known Carey's family all my life. In fact I rented, leased some – I farmed rice on his grandpa's land. I was a tenant farmer on him for about five years. I just trusted them. And I believe he would temporarily store a few or a couple of loads.

Fontenot said that approximately ten days after the verbal agreement he went out to the property and saw a pile comprised of rubble, concrete, asphalt, and broken pipe. On the top of the pile, which he described as higher than the ceiling in the courtroom covering an acre of land, was Fontenot's twenty-foot farm implement (a harrow) that he had purposely left near the road. He said that he thought that he and Lachney had a differing opinion of what constituted a "few loads" so he went to the Gilchrist office where Lachney reassured him that he would remove it all and restore

7

the land.  Fontenot testified that the harrow was never replaced.  He said he never gave Gilchrist permission to dump anything on the property and leave it there.

Fontenot next reviewed discovery responses by Gilchrist in which Gilchrist denied that it was aware that the dirt pit left on the property was not to Plaintiffs' satisfaction.  Other pertinent discovery responses by Gilchrist regarding the oral agreement that was entered into between Fontenot and Lachney include (emphasis added):

> REQUEST FOR ADMISSION NO. 13
> Please admit or deny that Exhibit 1 does not provide for the disposal or dumping of material in or on the Fontenot/Wilder property.
>
> RESPONSE:
> It is admitted that Exhibit 1 does not give Gilchrist permission to dispose or dump material on the Fontenot/Wilder property.  **Drew Fontenot gave Alsey Lachney verbal permission for temporary disposal of material on the Fontenot/Wilder property.**
>
> REQUEST FOR ADMISSION NO. 14
> Please admit or deny that a representative of Gilchrist Construction Company, L.L.C. asked Drew Fontenot if Gilchrist Construction Company, L.L.C. could temporarily dump "a couple of truckloads" of material on the Fontenot/Wilder property.
>
> RESPONSE:
> It is admitted that Drew Fontenot gave verbal permission to a Gilchrist representative to temporarily dump material on the Fontenot/Wilder property.  It is denied that the permission was limited to a "couple of truckloads."
>
> REQUEST FOR ADMISSION NO. 15:
> Please admit or deny that in obtaining permission to temporarily dump material on the Fontenot/Wilder property, a representative of Gilchrist Construction Company, L.L.C. assured Drew Fontenot **that all such material would be removed from the property.**
>
> RESPONSE:
> Admitted.
>
> REQUEST FOR ADMISSION NO. 16:
> Please admit or deny that Gilchrist Construction Company, L.L.C. dumped and/or disposed of multiple truckloads of material, including concrete, asphalt, and /or debris, on the Fontenot/Wilder property.

<u>RESPONSE:</u>
It is admitted that Gilchrist dumped multiple truckloads of materials on the Fontenot/Wilder property. It is denied that the materials were "disposed of" on the Fontenot/Wilder property.

. . . .

<u>REQUEST FOR ADMISSION NO. 18:</u>
Please admit or deny that Gilchrist Construction Company, L.L.C. has removed all materials which were dumped or disposed of on the Fontenot/Wilder property.

<u>RESPONSE:</u>
Admitted.

<u>REQUEST FOR ADMISSION NO.19:</u>
Please admit or deny that Gilchrist Construction Company, L.L.C. buried materials, included concrete, asphalt, and/or debris, on the Fontenot/Wilder property.

<u>RESPONSE:</u>
Denied.

Fontenot testified that Gilchrist had not removed all of the surface debris and that Gilchrist buried construction debris on Plaintiffs' property, which he only learned of after the lawsuit was filed. He said that, although the excavation was completed in 2008, by 2010 the property had still not been cleaned up. He reviewed extensive photographic and video evidence of the debris and buried concrete on the property. Fontenot testified that he only wanted the debris removed and the property restored. On cross-examination, Fontenot was certain of Lachney's promise to remove and restore:

Q. Okay. But Alsey never told you that he was going to return the land to its original condition. That was never the words, was it?

A. Oh, yes, that was his words.

Q. I will return the land to its original condition?

A. I will remove and restore it to like you had it. I don't know how it was. Maybe you are right, maybe there are three words that are different. But I know what the content of that conversation was. Cause we talked about I wanted to be able to look at my topsoil when they got through removing a few or a couple of loads.

9

*June Wilder*

June testified that she currently resides in Metairie, Louisiana, and works as a chaplain for the New Orleans Police Department. She stated that Fontenot has always had her full authority to manage the farm on her behalf and that she authorized all of the dealings with Gilchrist. June testified that the property looks nothing like it did before Gilchrist arrived and that farm equipment could not be used on the land because it would tear up the equipment since there is so much concrete and asphalt remaining on the land.

*Earl Garber*

Garber attained a Bachelor of Science degree in agronomy in 1974 and is a licensed crop consultant through the Louisiana Department of Agriculture. He was tendered as an expert in soil science and soil restoration. Garber testified that the only way to restore the area and remove the concrete, asphalt, and rebar from the soil would be to remove three feet of soil everywhere and replace with new soil. He stated:

> Based on the removal of all of that material that I saw in my observations, which I feel will absolutely interfere with a normal farming operation that has equipment that can be damaged, and the fact that some of the data that came from Mr. Daigle's report in relation to how the soil pH has been changed on the farm, it just seems to me like the only logical way to solve this is to remove the soil and replace.

Garber testified that he noted gravel throughout the property which should not be present at all in the type of soil existing in Allen Parish. He further discussed pH levels in detail using Daigle's testing to show that the pH levels were not normal for the area. Garber said that the land was not farmable in its present condition because of the obstructions consisting of fragments and boulders. He concluded that with the "combination of the objects out there, the fragments, and other items, along with the complication of the pH, the two together becomes a significant problem, and I

think the best way would be to remove." He stated that the concrete, asphalt, and rebar all needed to be removed. In conclusion, he noted that he had never seen anyone farming rice on top of a landfill.

*James Landraneau*

Landraneau, a civil engineer and land surveyor, testified regarding the pictures and surveying he conducted at the site. He also reviewed data provided by Defendant. Using Defendant's data, Landraneau determined that 12,000 cubic yards of dirt were removed from a separate pit (the ghost pit) on the Wilder property then, unexplainably, filled back up. Landraneau was also of the opinion that road construction debris was dumped in the main pit and that it was essentially being used as a landfill by Defendant. Landraneau described the type of road construction debris found subsequent to the surface clean-up efforts undertaken by Defendant:

> There was box culverts on the project, concrete structures, pipe – And what we found, -- asphalt, soil cement base. What we found on the site, on the surface, was material that fit that description. What we found buried were large pieces of what I call structural concrete. That is concrete that is very thick. I am not talking about like a person's driveway. But I am talking about eight – ten inches in thickness with steel reinforced bars in the material. We found evidence of the bars by themself. [sic] We found evidence of the bars in the structural concrete blocks that were buried on the site. And we found corrugated pipe, metal pipe, and the same type of material in the bottom of the pit when it was drained, and along the edges of the pit.

Landraneau gave detailed measurements of the cubic feet of the pit at the time of excavation (180,000 cubic yards) and after (120,000 cubic yards). Landraneau concluded that a two-acre area was excavated but not shown on Defendant's final survey. He assumed that Defendant did not pay Plaintiffs for that work since it was not included on the survey. When asked what would be required to remove all of the debris from the 30-acre affected area and to restore it to what it was before, Landraneau stated that the soil would have to be hauled away and replaced with suitable material except in the pit where the material would only need to be hauled

11

away. He agreed with Garber that a depth of at least three feet would be a reasonable depth to remove debris and restore the land. He further opined that the entire area would need to be excavated because:

> What we have found is that the affected area has material that has been either buried to depths of five to six feet, which I think the video and the photographs clearly indicate. But it is not in one place, and it is not done systematically other than maybe the ghost pit and maybe the perimeters of the pond. But where we have photographs to document the depth, it is so pervasive throughout the whole site that the only way to be sure that you are getting is to clean the whole site.

Landraneau testified that Charles Kingrey's estimate of $3,935,362.00 to remove and excavate the 30.47-acre area was a conservative estimate and certainly reasonable. He further felt that Kingrey's $1,623,036.00 estimate to restore the property was reasonable.

### Charles Kingrey

Kingrey, owner of Kingrey Dirt Work, Inc., testified that he has been in the dirt business for almost forty years. He testified to the extensive experience he has in a variety of large industrial projects requiring dirt. Kingrey said that he had contracted with many landowners to excavate dirt from their land. He testified he had done several jobs for Defendant. Kingrey computed total removal costs that included excavation, loading, trucking to a landfill, and dumping of the 30.74 acre affected area at $3,935,962.00. He calculated the restore cost of 16.57 acres at a depth of three feet and a volume of 110,673 cubic yards at a total cost of $1,623,036.00. Kingrey gave detailed testimony at how these figures were calculated which included fifteen trucks working eight hours per day for two hundred and sixty-seven days. Hauling costs amounted to $2,243,080.00, excavating and loading costs amounted to $1,068,000.00, and disposal costs amounted to $624,882.00 for a total of $3,935,962.00 for loading, hauling, and disposing. He testified that this was a very conservative estimate.

12

On cross-examination, Kingrey further testified that "in every area that we dug, there was soil cement, concrete, metal, asphalt, plastics" and that it would not be possible to sift out good dirt from soil cement and bring the other stuff to the landfill. He testified that the construction debris "is everywhere out there."

***Defendant's Case***

***Alsey Lachney***

Lachney testified that he worked at Gilchrist for sixteen-and-a-half years before he was terminated due to a dispute between him and the owner. Lachney testified regarding the temporary storage of material on the Wilder property: "and he said how much, and I said a few loads." He said that he requested that some concrete loads be temporarily stored on the property until the concrete crusher could be obtained. Lachney denied any knowledge of the farm implement being on top of the concrete pile. He admitted that he told Fontenot that Defendant would clean up the property.

Lachney was questioned by defense counsel:

Q. Did y'all ever dump in the pit?

A. Yeah, we dumped some concrete in the pit right there, on the edge.

Q. You dumped what?

A. Some concrete to the build that edge, to build that road. Cause we asked him and he wanted it right there.

Q. Okay. Let's define dump. You placed concrete along that little road that goes out into the pit?

A. Yeah, he wanted that there.

Q. Okay. You consider that dumping?

A. Let me change that. I didn't. Dirk placed that.

Lachney admitted that he entered into a verbal agreement with Fontenot to temporarily place debris on his property that would all be removed and the property

13

cleaned up to his satisfaction. He admitted that he told Fontenot that he would treat the property as if it were his own. He further confirmed his prior deposition testimony that Defendant was obligated to clean up the chunks of concrete left on the property. Further reviewing his deposition, Lachney was asked, "Mr. Fontenot never agreed to allow Gilchrist to dump concrete in the pit. Answer, correct. Right?" to which Lachney stated that was still the truth. Lachney said that before he left the job, the surface concrete was removed and that he did not know that there was any concrete beneath the surface. He testified that Defendant would have cleaned up everything if Fontenot would have let them complete the job.

### Kevin Grage

Grage, a twenty-seven-year employee of Gilchrist, testified that he went out to the property and conducted an inspection after Fontenot called him. Grage said that there was concrete, asphalt, PVC pipe, and "stuff like that" on the property that should not have been there. Grage contacted Dirk Fontenot and arranged for the property to be cleaned. Grage said that Drew Fontenot was pleased with the work that was done and that was the end of the story. Grage knew nothing of the buried concrete and construction debris and, at that time, the pit was full of water so the material dumped in the pit could not be seen. Grage admitted that the property was not left to the satisfaction of the owner and that concrete chunks should not have been left on the property. He testified that it was Defendant's duty to clean it up. Grage said that, had he known there was construction debris buried underneath the property, he would have handled the matter differently.

### Dirk Fontenot

Dirk Fontenot, a 20-plus-year employee of Gilchrist, testified that he was called by Grage to do a cleanup of the pit on the Wilder property over a 40-acre area. He said that he met with Drew Fontenot at the site. He noticed concrete, rebar,

14

plastic pipe, and asphalt on the property. He worked cleaning up the site for about a month. He denied burying any of the debris. Dirk said he removed about six truckloads of concrete with "a bunch of rebar in it" from the site. Dirk said that Drew Fontenot seemed pleased with the work completed, but that in November 2010, he called to report finding more concrete. Dirk said that he went back to the site but, because of the rain, the crew was not able to accomplish much. Dirk said that after that time they never went back to the site. Dirk stated that the cost of the clean-up amounted to $76,431.77. On cross-examination, Dirk was questioned:

> Q. In your cleanup you said that you more or less scraped the surface, maybe down to a couple of feet, and that is all of the huge amounts that we have seen in those photographs, correct?
>
> A. There is some areas where we went deeper.
>
> Q. How deep?
>
> A. Some areas were six to eight foot deep. Like I said earlier, I didn't pull a tape measure out, you know.
>
> Q. How did you know when to go six to eight foot deep?
>
> A. We would just trace it down til we quit finding it.
>
> Q. And it was – how does something get eight feet deep? How does road construction debris get eight foot deep? It doesn't get there accidentally?
>
> A. No, no it doesn't. It is a hole. Somebody has got a hole.
>
> Q. Gilchrist had to have dug a hole and had to have dumped debris in it, correct?
>
> A. Correct.
>
> Q. And buried it, covered it, right?
>
> A. Yes.

Dirk said his job was only to scrape the surface.

*Jerry Daigle*

Daigle, a retired soil scientist, was admitted as an expert in agronomy, soil science, soil classification, soil mapping, soil interpretation, and soil restoration. Daigle was to present a slide show explaining soil types, but Plaintiffs' counsel objected. Instead, Daigle gave an in-depth lecture about soils. He concluded that Kingrey's estimation of 12 or 18 inches of topsoil for restoration was "not natural" and that the range in Allen parish is "around four to around eight or nine inches." He further concluded that:

> The other things is there is a proposal to take all this soil out, haul it away and bring it in with something compatible with what was there originally. If you look at the Soil Survey, again, the soils that were there originally were silt loams and silty clay loams. The soils that are there now are silt loams and silty clay loams. The exact same textures that were there originally. The only thing we lack now is chemical balance and soil structure to return. And that will happen over time. And they [sic] are ways to accelerate the process. And I am not gonna get into that, but that can be accelerated. So, as those soils sit on that property today to grow rice, there is, except for the few cobbles that need to be removed, there is no restrictions. . . . So, in my opinion the potential for problems with rice growing on this soil are minimal.

On cross-examination, Daigle admitted that he only sampled areas where Gilchrist had performed work on the soil. He took no control samples from undisturbed areas of the land and admitted that he "consulted with [Gilchrist lawyers] to make sure they didn't want me to find anything on a different scale[.]" None of his samples were taken from the ghost pits on the property although he hit a rock in one sampling and had to move north by twelve inches. He had no knowledge of the dumping. The testing consisted of 26 two-inch holes in the ground to determine the type of the soil. However, on redirect Daigle denied purposely avoided the ghost pits in his sampling.

*Frank Willis*

Willis, a civil and environmental engineer and geoscientist, was qualified as an expert. Willis disagreed with Landraneau's estimation of the of the volume of the pit. Willis determined that the pit was 14 acres. Willis' testimony was that, if there were 60,000 cubic yards of debris in the pit, someone would have noticed it. He opined that an $8.00 probe rod would have revealed concrete in the pit. He stated,

> To determine that you need to spend as much money as I am hearing to remove concrete from the bottom of the pond, you just need to be sure the bottom of the pond has concrete in it. And I would have probed it to get a starting point and then started digging in it to see how thick it is.

. . . .

A. I do not see where that was done.

Willis further testified that having concrete in the pond is not necessarily a bad thing as it gives structure to the pond. He concluded that there had not been enough investigation to determine if the pond needed to be completely excavated. Although he admitted that there was definitely concrete out there "and some of it looks terrible," he concluded that it was impossible to say how much concrete was present without more sampling. However, Willis gave a long analysis basically to say that if three feet of dirt was removed and construction debris placed in the pit, the three feet of dirt had to be moved somewhere and there is no evidence of where it had gone to. Willis came up with a figure of $711,480.00 based on seven- or eight-acres worth of buried concrete that would require removal and restoration. Willis spent about six hours on the property, although he was given two days. In that time, he did not go out to the property with a probe rod and a boat and test the pit for concrete.

*Applicable Standard of Review*

It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.

*Rosell v. ESCO,* 549 So.2d 840*,* 844 (La.1989).

While we will not disturb a jury's finding in the absence of manifest error, if

legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence." *Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So.2d 731, 735. *See also West Jefferson Levee Dist.*, 640 So.2d at 1278. Legal errors occur when a trial court applies incorrect principles of law and those errors are prejudicial; when such a prejudicial legal error occurs, the appellate court is required to review the record and determine the facts *de novo. Evans*, 708 So.2d at 735.

*St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., LLC*, 17-434, pp. 14-15 (La. 1/30/18), 239 So.3d 243, 254.

***Corbello versus Church***

In its first assignment of error, Defendant argues that the trial court changed the legal standard for the case four days prior to trial. It claims that the summary judgment of June 2014 only required that it restore the property to a condition suitable for farming and yet at trial, the standard had changed because the trial court (now comprised of a different judge after several recusals and the death of one judge) found on March 8, 2018, that the issue of whether the land was "farmable" was not relevant to the issue of whether remediation was required. Defendant argues that Plaintiffs originally had to prove that the land was no longer farmable and that, by the time of trial, they need only prove that materials remained on the property.

At the motion for new trial and now in brief, Defendant argues that the trial court determined that there was an express agreement to restore by stating that *Corbello* applied thereby removing that finding from the purview of the jury. We disagree. The issue of whether there was an agreement to restore and whether there was a breach of that agreement was a central issue in the week-long trial. The very first question on the jury verdict form addresses these issues: "Do you find that Plaintiffs have proven by a preponderance of the evidence that Defendant breached a contractual obligation it owed to Plaintiffs?" This question clearly includes both whether a contract existed to remove and restore and whether Defendant breached that obligation.

Moreover, Defendant's appellate counsel did not try the case. At trial, Defendant did not challenge whether it owed a duty to remove and restore. Every Gilchrist employee testified that Defendant was obligated to remove the construction debris left behind and bring the property back to the satisfaction of Drew Fontenot. This was not disputed. At trial, much like in *Corbello*, the issue of what would be required to restore the property was hotly debated. The experts addressed the very issues that Defendant now complains of–what would it take to restore the property–as that is what Defendant expressly agreed to do in its oral contract entered into by Lachney. Defendant had its opportunity to put on its witnesses who claimed the property was suitable for farming even with the buried pits of construction debris, but the jury obviously did not credit that testimony.

Defendant states in its brief:

> ***Four days prior to trial****,* the District Court issued a ruling, not only excluding Gilchrist's testimony regarding what was previously the central issue in the case, but ruling such testimony as being irrelevant. The ruling stated: "This Court believes the opinion that the land is 'farmable' is *not relevant* to the issue of whether remediation is required." This changed everything!

We disagree. The issue of whether the land was farmable was not the central issue in this case. The existence of a contract to remove and restore the land was not a central issue in this case. Defendant admitted in discovery and over the course of the trial that it was obligated to remove the construction materials and restore the land. The central issue in this case was whether Defendant breached that contractual obligation to restore. *Corbello* only becomes a factor in determining what reasonable restoration entails in a breach of contract dispute.

In brief, Defendant states, "The only other logical manner in which Plaintiffs could show damage to their property would be to establish that the existence of materials left on the property diminished the value of the land." Again, we disagree. Defendant claims that "by removing the requirement that Plaintiffs show that any materials left on the property resulted in damage to the property, Plaintiffs were entirely released from having to prove an essential and necessary element of their breach of contract claim." Moreover, Defendant mischaracterizes the burden bestowed upon Plaintiffs in this case, i.e., to prove that the land was no longer farmland.

The jury found that Defendant breached its obligation to remove and restore the property. While Defendant focuses on the nature and value of the property, the oral contract between the parties was that the construction debris would be removed, and the property restored to the satisfaction of Fontenot and Plaintiffs. Fontenot testified, and no one disagreed, that the land was farmland. Fontenot said that he wanted the property to be farmland as it was before and that is the obligation that was breached.

### *Corbello (Assignments of Error Two and Three)*

In its second assignment of error, Gilchrist argues that the trial court erroneously applied the standard set forth by the Louisiana Supreme Court in

*Corbello*, 850 So.2d 686. Defendant argues that it "did not clearly and expressly obligate itself, after full and complete negotiation, to restore Plaintiffs' property to its original condition as did Shell in *Corbello*." Many of Defendant's arguments rest on this notion that the application of *Corbello* completely changed the nature of this trial. The facts of *Corbello* are strikingly similar to the ones here, except that Shell had a written contract with the landowners to "'reasonably restore the premises as nearly as possible to their present condition.'" *Id.* at 694. The issue in *Corbello* was what constituted reasonable restoration. Shell argued that the award of $33,000,000.00 to restore the property was unreasonable as it was 300 times the market value of the land.

As in *Corbello*, the case at bar sounds in contract, not in tort as was the case in *Church,* 618 So.2d 874, which Defendant claims should control. The supreme court in *Corbello* made it very clear that market value has no bearing in breach of contract cases involving restoration. As in this case, the jury in *Corbello* was tasked with determining the cost of reasonable restoration. Accordingly, the supreme court in *Corbello* found that the jury did not manifestly err in casting Shell with $33,000,000.00 in cleanup and restoration costs. The supreme court stated:

> [W]e disagree with the arguments presented by Shell and find that the damage award for a breach of contractual obligation to reasonably restore property need not be tethered to the market value of the property.
>
> . . . .
>
> We held in *Roman Catholic Church v. La.Gas Serv. Co.*, 618 So.2d 874 (La.1993), which involved tortious damage to immovable property, that " … if the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm." *Id.* at 879-880.
>
> We find that damages to immovable property under a breach of contract claim should not be governed by the rule enunciated in *Church*.

We find that the contractual terms of a contract, which convey the intentions of the parties, overrule any policy considerations behind such a rule limiting damages in tort cases. We recognize that in some cases, as in the instant case, the expense of restoration of immovable property can be extremely high. However, while we find it logical in tort cases to tether the amount of damages by balancing the amount to be paid by the negligent tortfeasor against the goal to restore the plaintiff, as closely as possible, to the position which he would have occupied had the accident never occurred, this same logic should not be extended to breach of contract cases.

The measure of damages in breach of contract cases is governed by the four corners of the contract. In this case, Shell, a sophisticated company with vast experience negotiating oil and gas contracts, bound itself by contract to "reasonably restore plaintiffs' property to as near as possible to its current condition." Shell must not be allowed to now alter the terms of this contract by limiting its liability to an amount reasonably or rationally related to the market value of the property.

Thus, we decline to set forth a rule of law, suggested by Shell, that in cases of breach of a contractual obligation of restoration in a lease, the damage award to plaintiffs must be tethered to the market value of the property. To do so would give license to oil companies to perform its operations in any manner, with indifference as to the aftermath of its operations because of the assurance that it would not be responsible for the full cost of restoration.

*Corbello*, 850 So.2d at 693-95.

In assignment of error three, a variation on a theme, Gilchrist argues that "there was no express agreement to restore Plaintiffs' property to its original condition." The jury found that there was a contract to restore the property to its original condition. We find no manifest error in that finding. The testimony of Fontenot, Lachney, and others made it clear that an oral contract to restore existed between the parties. Furthermore, the actions of the parties made it evident that the parties were aware of the duty to restore since Defendant sent out people to do that very thing, i.e., Grage and Dirk Fontenot. The existence of a contract to restore the property, as noted above, was not disputed.

Next, Defendant reiterates its claim that leaving tons of construction debris buried underground are not "damages." In this assignment, Defendant argues that

the oral agreement between Fontenot and Lachney created a right of use, and the "obligation to use the property as a prudent administrator does not equate to a promise to completely restore the property to its original condition." Defendant further claims that Lachney's testimony that he did not recall using the word "restore," but instead used terms like "make it back to [Fontenot's] satisfaction" and that he would "treat the property like he would his own" are insufficient to create an obligation to restore the property. We disagree. As discussed below in the assignment relating to evidentiary rulings, the existence of the contract was not the issue. Defendant never denied that the oral contract to remove and restore existed, nor did it put forth any evidence suggesting that it did not exist. It only argues that now, in briefs to this court, after *admitting* in discovery responses to its existence. The issue in this trial was whether Defendant breached the contract by failing to remove the construction debris it left behind and whether it breached the contract by failing to restore the property. Defendant cannot now have a new trial at the appellate level on the issue of whether an oral contract existed. Defendant further raises for the first time on appeal the issue of Fontenot and Lachney's legal authority to enter into the agreement. This issue will also not be tried for the first time at the appellate level. This assignment of error is without merit.

*Prescription*

In this assignment of error, Defendant argues that since "there was no express agreement [to restore the property to its original condition], Plaintiffs' claims sound in tort and were prescribed." Defendant states: "Plaintiffs claim that Gilchrist exercised its right of use in such a manner which caused unreasonable damage and/or failed to properly repair the property in a prudent and workmanlike manner. Those claims sound in tort, subject to a one-year prescriptive period." For the reasons

23

mentioned above, this is a contract claim subject to a ten-year prescriptive period. *See* La.Civ.Code art. 3499.

The facts and factual findings of the jury in this case are that Defendant breached the contract by failing to remove the construction debris that was to be temporarily stored on Plaintiffs' property and failing to restore the property to its original condition. That contract was entered into sometime in early July 2007. Plaintiffs filed suit in 2012, well within the ten-year prescriptive period. This claim sounds in contract, not tort, and it is subject to a ten-year liberative prescription period. The claim was not prescribed. This assignment of error is without merit.

*Evidentiary Rulings*

In this assignment of error, Defendant again complains that it was not allowed to prove that Plaintiffs' property was not damaged because it was still suitable for farming, and the value of the property was not diminished. The value of the land in real-estate terms is completely irrelevant, as found by the trial court and for the reasons stated above. Pursuant to the reasoning in *Corbello*, the exclusion of the market value evidence was not in error.

Defendant further complains that its soil expert, Daigle, was prevented from using a PowerPoint presentation to give a lesson on soil types. The expert was allowed to testify and gave very thorough explanations of soil and what the effect of the dumping had on the soil and whether it was suitable for farming. The PowerPoint presentation at issue did not bear on issues critical to the jury's job. Daigle wanted to teach a lesson in soil types. The presentation would have been informative and would not have created confusion or delay. Therefore, it should have been allowed. However, we also find that it was harmless error to exclude the PowerPoint presentation because Daigle was allowed to testify and did so otherwise unfettered.

24

Finally, in this assignment of error, Defendant also complains about the last-minute discovery of even more buried boulders on Plaintiffs' property by Fontenot about which he commented at trial, "big boulders, more than I have ever seen," before the trial court shut down the line of inquiry after Defendant objected. We find this comment of little consequence, as the tons of buried construction debris had already been discussed and viewed by the jury. This assignment of error is without merit.

### Pre-trial Rulings

In its sixth assignment of error, Defendant continues its theme that there was a genuine issue as to whether the parties agreed to restore the property to its original condition. As previously noted, in discovery responses, Defendant admitted to the existence of the oral contract to remove and restore. Every Gilchrist representative, including the person who entered into the oral contract, testified as to the existence of the oral contract existing between Defendant via its agent, Lachney, and Fontenot. Defendant even sent out its employees (Grage and Dirk Fontenot) to attempt to restore the surface conditions of the property. Because there is no manifest error in the jury's finding that an agreement to remove and restore existed, the complained of statement that the trial court gave to the jury, that "Defendant disputes that the agreement calls for restoration of the property and disputes the nature, extent and costs of removal and restoration[,]" has no merit. It appears that Defendant is arguing that the jury verdict form should have included a question along the lines of, "Do you find that an express agreement to restore the property to its original condition existed?" The jury affirmatively answered this question in its finding that Defendant breached its contractual obligation. Moreover, Defendant failed to object at any of the stages relating to jury instructions or the verdict form.

Again, in this assignment of error, Defendant relies on what it claims is the erroneous application of *Corbello*. Defendant states in brief:

> There is no question that the Court's pre-trial rulings shaped the trial based upon the application of *Corbello* without the jury deciding the necessary question of fact (*i.e.* whether the verbal agreement contained an express agreement to restore the property to its original condition). No express promise to restore means no *Corbello*!

This argument ignores the fact that Defendant admitted in discovery that an agreement to remove and restore existed, that its employees testified to such an agreement, and that it introduced no evidence to refute the existence of the oral contract to remove and restore. Defendant cannot now backtrack via its brief and attempt to argue that that agreement did not exist because of what it deems to be an outrageous restoration award. This assignment of error is without merit.

*Damages*

In this assignment of error, Defendant argues that the damages awarded "are outrageously out of proportion with the value of the land." The value of the land is irrelevant and the reason for that is clearly explained by *Corbello*. A construction company would never remove and restore if it knew it would be advantageous from a cost-benefit standpoint to just leave the construction debris behind and bury it. As stated in *Corbello*:

> The remaining question, then, is whether the jury's award for restoration was reasonable. In determining damages, the trier of fact is accorded much discretion. The assessment of damages by jury is a determination of fact. The role of an appellate court in reviewing an award of general damages is not to decide what it considers to be an appropriate award, but rather, to review the exercise of discretion by the trier of fact. The adequacy of the award should only be determined by facts or circumstances particular to the case under consideration. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed. 2d 379 (1994).

*Id.* at 696.

Plaintiffs' experts, Garber and Kingrey, gave detailed explanations of how they arrived at the costs to remove debris and restore the property. Both testified that the sums were on the very conservative side. The jury clearly valued that testimony over Willis's testimony that the entire area probably did not need to be excavated. The jury obviously did not find Daigle's testimony persuasive, and we can find no manifest error in that finding. While Defendant goes to great length to discuss how buried concrete boulders, rebar, and construction debris really are not that harmful to the land and perhaps may even be of benefit to it, the jury did not agree. Defendant emphasizes that the award is seventy times the value of the property; however, it seems to completely miss the point that the cost to return the property to its former condition as it expressly agreed to do was $5,500,000.00. This assignment of error is without merit.

*Attorney Fees*

There are few premises of law more axiomatic than this: "As a general rule, attorney fees are not allowed in Louisiana unless they are authorized by statute or provided for by contract." *Langley v. Petro Star Corp. of La.*, 01-0198, p. 3 (La. 6/29/01), 792 So. 2d 721, 723. In the case at bar, the trial court instructed the jury (emphasis added):

> Now as a general rule, in Louisiana, attorney fees may not be awarded to a successful Plaintiff unless specifically provided for by statute or a contract. Plaintiffs contend that if you find in their favor, they are entitled, under the contract, to recover attorney fees *based on the Agreement to Buy and Sell Dirt* which provided that Defendant would hold Plaintiffs harmless from any future damages, injuries and/or claims arising from the mining of dirt. If you find in Plaintiffs', favor you must determine whether the parties intended for their contracts to allow Plaintiffs to recover their attorney fees from Defendant in the event Plaintiffs had to file a lawsuit over damage to their property.

The verdict form asked the jurors, "Do you find that Plaintiffs are entitled to attorney's fees under the contract?" to which the jury checked "yes." The trial court

thereafter set the amount of attorney fees at $2,200,000.00, following a lengthy hearing on the matter.

Defendant first argues that Plaintiffs' claims arise out of the verbal agreement and not the initial Agreement to Buy/Sell Dirt, as was presented to the jury. Defendant claims that the issue of attorney fees should be limited to the oral agreement regarding removal and restoration which states nothing about attorney fees. Defendant next makes the legal argument that the hold harmless provision in the Buy/Sell agreement does not mention attorney fees, that this standard indemnification clause applies to third parties, and that it is not applicable in an action to enforce a contract between the parties. Plaintiffs argue that Defendant's standard form contractual provisions must be interpreted against it as the drafting party and that neither the first nor second contract limits the damages to claims by third parties.

We agree with Defendant and find it was legal error for the trial court to submit the issue of attorney fees based on the Agreement to Buy/Sell Dirt. Although we defer to the jury's findings in all cases in the absence of manifest error, we cannot when the jury's finding is premised on an inaccurate application of the law. The Agreement to Buy/Sell Dirt is not the agreement that is the subject of this lawsuit. The entire issue at trial was the existence and breach of the contract to remove and restore. Even if the Agreement to Buy/Sell Dirt was the contract at issue, we agree with Defendant that "by its plain terms, the hold harmless provision only applies to 'damages, injuries and/or claims *arising from the mining of dirt and clearing of vegetation on the above tracts of land*.'" The specific language of the dirt contract upon which the award of attorney fees was granted states (emphasis added):

> The Seller will be held harmless by Gilchrist Construction Company L.L.C. from **any** future damages, injuries and/or **claims**

28

arising from the mining of dirt and clearing of vegetation on above tracts of land.

This is a standard third-party indemnification clause meant to indemnify Plaintiffs (obligees/indemnitees) in the event a third-party sued them as a result of a negligent act by Defendant (obligors/indemnitors). The general and well-established rule is that attorney fees must be expressly provided for in contract or a statute. *State, Dep't of Transp. & Dev. v. Williamson*, 597 So.2d 439 (La.1992). Moreover, there is no Louisiana jurisprudence authorizing the award of attorney fees in a direct indemnity contract except for the case of *Curtis v. Curtis*, 28,698 (La.App. 2 Cir. 9/25/96), 680 So.2d 1327. *Curtis* involved an indemnification agreement created between two former spouses. The court in *Curtis* found:

> In the present case, in the community property partition agreement, the parties agreed to indemnify each other for any losses sustained if one party failed to pay a debt assumed under the agreement. That provision provided as follows:
>
> > The parties further stipulate and agree that neither of the parties hereto shall have or enjoy the right to rescind this community property settlement due to any failure of either party hereto to pay the debt assumed by either of the parties hereto, provided, however, that either party hereto shall have the unrestricted right to demand of the other indemnification for any loss he or she might sustain by virtue of the other failing to pay the debts assumed herein.
>
> This clause constitutes a "hold harmless" or indemnity provision. An obligor under such provisions is liable for reasonable attorney fees incurred by the obligee, even though the obligatory provision does not specifically authorize attorney fees. *South Central Bell Telephone Co. v. Gaines Petroleum Co. Inc.*, 499 So.2d 521 (La.App. 2d Cir.1986). As stated above, we find that the 1994 income tax liability for Curtis Farms Partnership was a farming indebtedness assumed by the defendant in the agreement that he refused to pay. Therefore, the defendant was liable for the plaintiff's attorney fees. The reasonableness of an attorney fee is within the great discretion of the trial court. *Sims v. Hays*, 521 So.2d 730 (La.App.2d Cir.1988). Based upon the facts of this case, we find that the trial court did not err in awarding attorney fees to the plaintiff in the amount of $3,726.30.

*Id*. at 1332-33.

While *Curtis* found that attorney fees were implied, the facts of that case are inapplicable to the facts here. The language of the indemnity provision in *Curtis* clearly applies to the parties to the contract, i.e., the former spouses. The plain language of the indemnity provision in the Agreement to Buy/Sell Dirt reveals no indication that the agreement was a direct one. While any confusion could have been cleared up by the insertion of "third-party" before the word "claims" in the indemnity contract, we have no doubt that this indemnity contract was meant for third parties.

Regardless of how we may interpret the provisions of this contract, the more fundamental fact is that this case revolves around the breach of an entirely different contract, the oral contract to remove and restore. That contract was totally silent on the issue of attorney fees. Therefore, we find it was legal error for the trial court to submit the indemnification language to the jury to determine whether attorney fees were warranted under the Agreement to Buy/Sell Dirt. However, this does not end the inquiry regarding the award of attorney fees.

***Bad Faith Breach of Contract***

Louisiana Civil Code Article 1997 provides: "An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." The jury was specifically presented with the question of whether Defendant "acted in bad faith in breach of its obligation?" which it answered affirmatively. The trial court's judgment incorporates the bad faith finding as support for its award of attorney fees in favor of Plaintiffs as it states:

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that judgment is rendered in favor of plaintiffs, Juanita W. Fontenot and T. June Wilder, and against defendant, Gilchrist Construction Company, LLC, granting recovery of attorney's fees under the contracts, the jury's finding of bad faith, and as provided in Louisiana Code of Civil Procedure article 1472, in the amount of forty percent (40%) of the damages awarded as provided in the attorney-client contracts.

30

Although we find no manifest error in the finding that Gilchrist breached its obligation in bad faith, we find the trial court legally erred in awarding attorney fees pursuant to La.Civ.Code art. 1997. We note that Plaintiffs did not brief this issue in their appeal nor did the trial court address the bad faith breach award of attorney fees in its reasons for judgment. As Defendant points out, the courts of this state have repeatedly held that attorney fees are not allowed under La.Civ.Code art. 1997. The supreme court in *Sher v. Lafayette Insurance Co.*, 07-2441, 07-2443, p. 18 (La. 4/8/08), 988 So.2d 186, 201, unequivocally stated as such:

> Plaintiff argues that, pursuant to C.C. art. 1997, he is entitled to attorney's fees due to Lafayette's bad faith breach of contract. Louisiana courts have long held that attorney's fees are not allowed except where authorized by statute or contract. *E.g., Rivet v. State,* 96–0145 (La.9/5/96), 680 So.2d 1154; *State, DOTD v. Williamson,* 597 So.2d 439, 441 (La.1992). Article 1997 reads in its entirety, "An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." Neither the statute nor the insurance contract mentions attorney's fees. In keeping with our past holdings, we find that in cases of breach of contract, Article 1997 does not provide for an award of attorney's fees.

Accordingly, we find the trial court legally erred in awarding attorney fees pursuant to this statute. Nevertheless, the legal error did not prejudice Defendant, as attorney fees were properly awarded under La.Code Civ.P. art 1472.

***Louisiana Code Civil Procedure Article 1472***

> Louisiana Code of Civil Procedure article 1472 provides:

> If a party fails to admit the genuineness of any document or the truth of any matter as requested under Article 1466, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, he may apply to the court for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court shall make the order unless it finds that the request was held objectionable pursuant to Article 1467, or the admission sought was of no substantial importance, or the party failing to admit had reasonable ground to believe that he might prevail on the matter, or there was other good reason for the failure to admit.

31

A trial court has vast discretion in awarding attorney fees under this statute, and we will not disturb its finding in the absence of abuse of that discretion. *Anderson v. Moreno's Air Conditioning, Inc.*, 14-27 (La.App. 3 Cir. 6/4/14), 140 So.3d 841*, writ denied*, 14-1392 (La. 10/3/14), 149 So.3d 800. In *Brodtmann v. Duke*, 98-1518, pp.7-9 (La.App. 4 Cir. 3/21/01), 803 So.2d 41, 45-46, *writs denied*, 01-3184, 802 So.2d 637 (La. 12/05/01), 02-0334, 813 So.2d 409 (La. 4/12/02), the appellate court discussed Article 1472:

> A court shall order the award of reasonable attorney's fees if the party from which the information is sought fails to admit the genuineness of any document or the truth of any matter as required by Article 1466, and the genuineness of the document or the truth of the matter is proven at trial. The trial court shall make this order unless the request was objectionable, the admissions sought were of no substantial importance, the party failing to admit had reasonable grounds to believe that it might prevail in the matter, or there was a good reason for the failure to admit. The fees awarded would be the reasonable expense incurred in proving the truth of the requested admission. *See Cotton v. Credit Gen. Ins. Co.,* 97–2674 (La.App. 1 Cir. 12/28/98), 723 So.2d 1083. The trial court has wide discretion in determining whether to award attorney's fees given the broad exceptions provided in Article 1472.

> This Court has previously held that in the situation where a party fails to admit a fact *during* discovery that is later proven at *trial* and later fails either to show reason it could not have admitted that fact or that it had reasonable grounds to believe that it might prevail on the particular factual matter at trial, that party may be subject to an order for expenses and attorney fees. *See New Orleans Public Service, Inc. v. Checker Cab Co.,* 332 So.2d 489 (La.App. 4th Cir.1976). (Emphasis Supplied). The imposition of these sanctions must be carefully weighed against the recognition of the ultimate purposes of the adversarial system in the law. The purpose of the discovery process is *not* to force the opposing party to admit to the contested facts that are at the heart of the ultimate dispute. Rather, the central purpose of the discovery rules is to require the admission of facts which *ought not* to be disputed at trial, so as to eliminate the time, trouble and expenses of proving facts that are undisputed. *See Boseman v. Orleans Parish School Board,* 98–1415 (La.App. 4 Cir. 1/6/99), 727 So.2d 1194, *writ denied,* 99–0390 (La.4/1/99), 742 So.2d 554. (Emphasis Supplied). When a party refuses to answer interrogatories during discovery, their refusal must fit within one of the exceptions to Article 1472. If the trial court, within its discretion, does not find that the reason for the refusal fits into one of the exceptions, then it shall impose the sanctions provided for within the article.

In *Boseman,* the only articulated reason given for the opposing party's failure to admit certain facts during the discovery process was that parties often fail to disclose pivotal facts during the discovery phase of a trial. This Court did not accept that as a reasonable basis for refusing to answer inquiries during discovery under Article 1472, and, as a result, it ordered the payment of reasonable attorney's fees and expenses. This Court based its reasoning on the idea that "the failure to properly admit a fact not in dispute causes serious injury to the opposing party, the most important of which is the fact that it causes excessive adversarial conduct on the part of lawyers; this in turn leads to increased costs, delay, disrespect for law, unprofessional conduct, and disillusionment with the practice of law." *See Id.* at pp. 8–9, 727 So.2d at 1198.

The trial court has discretion about whether or not to impose the sanctions provided for in Article 1472, and this decision must be afforded deference by the appellate court. However, the decision of a trial court will not be given deference by this Court if the trial court's decision was based on an erroneous interpretation of the law rather than a valid exercise of discretion. *See Huddleston v. Farmers–Merchants Bank & Trust Co.,* (La.App. 3 Cir. 11/2/00), 772 So.2d 356. In short, the trial court must comply with the law provided by the Code of Civil Procedure. If it does, then the appellate court must respect the decision of the trial court. If, however, it does not comply with the rule of law, the appellate court must disregard the trial court's decision and apply the proper rule of law.

In determining whether the party failing to admit a fact during discovery had reasonable grounds to believe that it might prevail, the proper test is whether the party acted reasonably in believing that it might prevail. *See Harolds Stores, Inc. v. Dillard Dep't Stores,* 82 F.3d 1533, 1555 (10th Cir.), *cert. denied,* 519 U.S. 928, 117 S.Ct. 297, 136 L.Ed.2d 216 (1996).

Regarding the award of attorney fees under this article, the trial court in its

reasons for judgment stated:

The court grants Plaintiffs' Motions to Set Attorney Fees and Expenses under Code of Civil Procedure Article 1472. The defense has steadfastly denied responsibility for the buried debris from the time of Answer, during discovery, in witness testimony and even in arguing the last Motions filed. Mr. Lachney testified at trial that there was no reason for Gilchrist to bury debris, when they could crush and sell the concrete; he admitted, however, that the crusher was moved to another location before the project was completed. As proof of their claim, Fontenot testified he saw a bulldozer moving the debris around the pit area and that he found shallow beds of concrete debris after a rain. Further, Plaintiffs' expert located the map that revealed that there were 5 smaller pits dug and filled in, in conjunction with the larger 30 acre

pit, which Drew Fontenot drained and found buried concrete debris. Subsequently, Fontenot and the expert Kingsley began to probe with a large machine and found debris at various lower levels. The request for admissions also shows Gilchrist denied that there were no surveys with payments, even though they responded to another Request with the information that truckloads were used instead of surveys.

The defense has argued against the application of C.C.P. 1472, dismissing the difficulty of the proof required to overcome the refusal to admit to the buried debris. The court does not accept that leaving the surface debris for 3 years and the buried debris forever is of no consequence to this case and, thus, not a breach of the contractual obligations and not of sufficient importance to warrant the application of Art. 1472 for attorney fees and expenses. As the court sees it, the defendant has returned to the *Church* case, arguing that restoration to a former condition is not required under the contracts, even though the jury found that the defendant had breached the contracts, was in bad faith and attorney fees should be awarded. This court accepts the *Corbello* standard for damage to immovable property in breach of contract cases, the jury verdict and concomitant application of Article 1472, under the language of *Corbello* . . .[.]

. . . .

While there is no third party public issue here, the contract price is being paid by the tax payers and the road being built is for public use. The party found in breach and bad faith is a large and sophisticated business entity and the parties injured are farmland owners and members of the public. . . .

. . . . There was nothing in the testimony of either Lachney or Fontenot to suggest either of them believed the contract was meant to equate "removed" with "hidden under ground." This court accepts that the defendant persisted in denying the breach and the burial of debris and that these issues are the heart of the dispute.

The court sets the attorney fee at 40%, in accordance with the original contract with Mr. Nesom and the subsequent contract with additional attorneys, which is the well-known and standard fee for plaintiff attorneys in a damages case.

We find that the trial court did not err in the application of La.Code Civ.P. art. 1472 to the facts of this case as the record supports the trial court's finding. Defendant denied burying construction debris on Plaintiffs' land and denied that it had not removed all of the debris. It never wavered from this claim from the beginning of trial through now.

Defendant relies on *Brodtmann,* 803 So.2d 41, to assert that the attorney fees awarded under this statute must be limited to costs associated with proving the fact Defendant denied, i.e., the burying and failure to remove the construction debris. In *Brodtmann,* the appellate court affirmed the trial court's denial of attorney fees under this article and did not expound on the reasonable costs issue. In this case, the burying of construction debris and failure to remove it was a central issue in this case. Defendant had no basis for denying that fact. The jury found Defendant was in bad faith for breaching its obligation. Moreover, we must give deference to the trial court. A large part of the trial revolved around this issue. Accordingly, the award of attorney fees is appropriate under La.Code Civ.P. art. 1472.

Thus, the only authority supporting an award of attorney fees is found in La.Code Civ.P. art. 1472. Since its inception in 1976, Article 1472 has rarely been used to award attorney fees. In *Boseman v. Orleans Parish School Board*, 98-1415, pp. 8-9 (La.App. 4 Cir. 1/6/99), 727 So.2d 1194, 1198, *writ denied*, 99-0390 (La. 4/1/99), 742 So.2d 554, the appellate court noted as such along with the reasoning behind Article 1472:

> A review of the caselaw interpreting La.C.C.P. art. 1472 reveals that parties rarely take advantage of its provisions. However, this court has previously held that a party who fails to admit a fact later proven at trial, then fails to either show reasons it could not have admitted the fact or show that it had reasonable grounds to believe that it . . . might prevail on the particular factual matter at trial may be subject to an order for expenses and attorney fees. *New Orleans Public Service, Inc. v. Checker Cab Co.*, 332 So.2d 489 (La.App. 4 Cir. 1976). The court stated as follows:
>
> > The purpose of sanctions against parties who unjustifiably resist discovery is to make the discovery articles effective. C.C.P. art. 1496 [now La. C.C.P. art. 1466] was designed to require the admission of facts which ought not to be disputed at trial, so as to eliminate the time, trouble and expenses of proving uncontroverted facts. C.C.P. art. 1514 makes the admissions procedure workable by imposing the cost of proof upon the litigant who improperly refuses to admit a matter. See 8 Wright

and Miller, Federal Practice and Procedures 2290 (1970), discussing Federal Rule 37(c).

*Id*. at 490 (some footnotes omitted).

. . . The failure to properly admit a fact not in dispute causes serious injury to the opposing party, the most important of which is the fact that it causes excessive adversarial conduct on the part of lawyers; this in turn leads to increased costs, delay, disrespect for law, unprofessional conduct, and disillusionment with the practice of law. The harm to society also includes the inefficient use of the judicial process and the waste of judicial resources protected by the rules requiring admission.

The *Boseman* court awarded $1,000.00 for expenses and attorney fees. *McElveen v. City of New Orleans*, 03-1609 (La.App. 4 Cir. 9/14/04), 888 So.2d 878, *writ denied*, 04-2527 (La. 12/17/04), 888 So.2d 870, in which the appellate court affirmed the trial court's award of $11,130.90 for attorney fees and costs, represents the highest amount awarded to date under La.Code Civ.P. art. 1472. A panel of this court reversed the trial court's denial of an award under La.Code Civ.P. art. 1472 in *Knepper v. Robin*, 99-95 (La.App. 3 Cir. 11/17/99), 745 So.2d 1248, and awarded $10,000.00 in attorney fees, but the supreme court reversed the award. *Knepper*, 99-3572 (La. 2/18/00), 754 So.2d 955. The other decisions involving awards under this statute involve minimal amounts. *See Addison v. Thompson*, 556 So.2d 195 (La.App. 2 Cir.), *writ denied,* 559 So.2d 1386 (La.1990) (affirming award of $1,000.00 in attorney fees); *Settles v. Paul*, 46,209 (La.App. 2 Cir. 4/13/11), 61 So.3d 854 (affirming award of $5,000.00 in attorney fees); *See v. Entergy Corp.*, 09-535 (La.App. 3 Cir. 11/4/09), 24 So.3d 267 (affirming award of $2,000.00 in attorney fees); and, *New Orleans Pub. Serv., Inc. v. Checker Cab Co.*, 332 So.2d 489 (La.App. 4 Cir. 1976) (affirming award of $100.00 in attorney fees).

While Defendant failed to admit the existence of the buried debris, a fact it could not reasonably deny, we find that the trial involved other issues such as the contracts between the parties, the law applicable to the facts at hand, and the extent

of the removal and restoration required. Nevertheless, we find the issue of the buried debris to be a significant one as did the jury.

The trial court heard an hour-and-a-half of testimony regarding the attorneys' work in Plaintiffs' case, amounting to between 6,000 to 8,000 hours over the course of seven years of litigation. During that time, Plaintiffs' counsel had to deal with issues of lost documents and missing computer records. In 2013, Plaintiffs' counsel spent a significant amount of time arguing over discovery, reviewing documents, and amending responses all while attending site inspections and attempting to depose Gilchrist employees. He testified to problems that arose from conflicting responses from Defendant's various attorneys that all had to be reconciled. Trial preparation, including preparing to prove that debris was buried on Plaintiffs' property, occupied at least two lawyers working full time on this case alone for at least three months. Nevertheless, there were other issues in the case besides whether debris was buried on the property; accordingly, we find that the trial court erred in awarding 40% of the total jury award. We find that the most that can be awarded under La.Code Civ.P. art. 1472 for attorney fees is $1,000,000.00. Accordingly, we amend the award of attorney fees to $1,000,000.00.

## CONCLUSION

The jury did not manifestly err in finding that an oral contract to remove and restore existed and that Defendant breached that contract in bad faith. Accordingly, the judgment of the trial court awarding Plaintiffs-Appellees, Juanita W. Fontenot and June T. Wilder, $5,559,000.00 is affirmed. The award of attorney fees is amended and reduced to $1,000,000.00. All costs of this appeal are assessed against Defendant-Appellant, Gilchrist Construction Company, LLC.

**AFFIRMED AS AMENDED.**